## Case No. 11,529.

### RAFT OF SPARS.

[Abb. Adm. 485.] [1]

District Court, S. D. New York.    Feb., 1849.

ADMIRALTY JURISDICTION — DRIFTING RAFT — SALVAGE—COMPENSATION—DISTRIBUTION.

1. The rescuing a raft of timber found adrift in harbor, and floating out to sea unaccompanied by any person, is in its nature a maritime salvage service, for which salvage compensation may be awarded.

[Cited in Fifty Thousand Feet of Timber. Case No. 4,783; Salvor Wrecking Co. v. Sectional Dock Co.. Id. 12,273; Raft of Cypress Logs, Id. 11,527; Maltby v. Steam Derrick Boat, Id. 9,000; Cope v. Vallette Dry-Dock Co., 119 U. S. 630, 7 Sup. Ct. 338; Cope v. Vallette Dry-Dock Co., 16 Fed. 926; Seabrook v. Raft of Railroad Cross-Ties, 40 Fed. 597; Bywater v. A Raft of Piles, 42 Fed. 918.]

2. The law governing such cases in England,—considered.

3. The considerations which should govern the court in adjusting the amount of salvage compensation, and its distribution amongst the salvors, in case of timber found adrift and rescued, —stated.

[Cited in Cope v. Vallette Dry-Dock Co., 10 Fed. 145; The Orange, 46 Fed. 408.]

This was a libel in rem, filed by John S. Keteltas, with whom other libellants were afterwards joined on petition, against a certain raft of spars, to recover compensation for salvage service. The cause was brought before the court in May, 1848, on a motion to set aside the action or stay proceedings in it, until a replevin suit which had been commenced in the supreme court of the state of New York, by the owner of the timber against the libellants, who claimed to hold it by virtue of a lien for their salvage, should be determined. The decision of the court denying that motion is reported [Case No. 11,528]. The cause now came up for final hearing. The grounds of the libellants' claim are fully stated in the opinion of the court.

BETTS, District Judge. The libellants claim a salvage reward for arresting a raft of sixteen spars, which they found afloat below the Narrows, and towing it ashore and securing and watching it there, until it was removed by the claimants. On the night of the 7th of April last, the spars floated out of a basin on the East river, in this harbor, where they had been kept by the claimants, and at daybreak the next morning were discovered by the libellants, drifting to sea on a strong ebb tide, about a half a mile from the shore. Evidence was given by the claimants tending to show that the spars must have been tortiously abstracted from the basin;

[1] [Reported by Abbott Bros.]

but if the fact was so, there is no proof connecting the libellants with the commission of any improper act, or the knowledge of it in respect to the spars. They were eleven or twelve miles below the city, out in boats opposite their residence engaged with their fishing-nets, when the raft was discovered floating past them.

The spars were, at the time, secured together by a chain passing through staples driven into the end of each log, and unaccompanied by any person. The whole body was drifting off to sea at the rate of two to three and a half knots the hour. It was proved, that at that period of the year little or no flood tide makes up the channel below the Narrows; so that it must be nearly hopeless that the raft would be floated back into the harbor or its coasts by a return tide.

One of the libellants rowed off in his boat alone to the raft, fastened a line to it, and towed or turned it within his fishing hedges or poles, so as to stay or check its progress to sea; and then two other boats put off successively with two of the libellants in each, to his assistance, and the five persons, by aid of the three boats and an anchor, succeeded in towing and warping the raft to the beach and making it fast there. They were occupied in this business from daylight to between seven and eight o'clock in the morning,—a period of about two or three hours.

It is contended, 1. That no case is made out by the libellants which falls within the jurisdiction of the court. 2. That at most, the transaction was mere towage, and not one of a salvage character.[2]

In my opinion, the relief given on the occasion was in its nature maritime salvage, and accordingly the claim for remuneration may be pursued by the libellants in this court. The English admiralty clearly admit the principle that services of this description are of a salvage quality; but it is held that maritime courts cannot take cognizance of the case when the service is rendered within the body of a country, the jurisdiction then appertaining to the courts of law; and the admiralty court would be subject to interdiction if it attempted to entertain a salvage claim for such service.

Nor was that impediment to the jurisdiction of the court removed or so enlarged by the act of 3 & 4 Vict. c. 65, § 6, as to embrace a case like the present, because the provision of the act is limited "to any ship or sea-going vessel." Raft of Timber, 2 W. Rob. Adm. 251.

The last decision was rendered previous to the passage of the act of 9 & 10 Vict. c. 99, § 40, which gives the admiralty jurisdiction in salvage, for services performed, "whether in the case of ships, goods, or other articles found at sea or cast ashore;" and the provisions of

the latter act, carry the jurisdiction of the English admiralty no further than its accustomed exercise in the United States. Waring v. Clark, 5 How. [46 U. S.] 441; The Wave [Case No. 17,297].

In the present case, the raft was adrift on tide-waters, rapidly floating out to sea, and its rescue was clearly an act of salvage service. The court has, on a former occasion, expressed the opinion that the institution of an action of replevin by the claimants, did not affect the jurisdiction of this court (Raft of Spars [Case No. 11,528]), and that those proceedings were not of a character to afford the libellants a ready and full recompense, so as to render it equitable that they should be restrained to their remedy in the court of law under that proceeding.

The service rendered by the libellants, although opportune and valuable to the claimants, was not in itself one of hazard, or characterized by any features of extraordinary merit. One man in a boat met the raft coming down on the tide, and was enabled alone to turn its direction and bring it within the check of his fishing stakes, and then, by aid of two other small boats, to tow it to the beach. The distance it was so carried was only about half a mile, and only about three hours' time was occupied in that service. If the raft had been reclaimed at that stage of the transaction, it is manifest a slight compensation would have covered all that could have been justly demanded.

The shore at that place is exposed to the sea surf, and it became necessary for the preservation of the raft, to separate the logs and get them on to the beach, and so secure them with stakes and lines as to protect them from being washed off by the surge and tide. To accomplish this, the day was spent by five men, most of the time in the water, and they were afterwards compelled to keep a watch over the timber at high tide, to guard against its being swept away. This service continued for four or five days, but was no way hazardous or laborious.

The libellants took the earliest measure to have notice published in a city paper, of the rescue of the raft and its situation. In every thing within their power to do, their conduct appears to have been upright, correct, and prompt. When the raft was discovered by the claimants, the highest compensation intimated by them for the services of the salvors was the sum of $30, and that implied offer was accompanied by insulting and discrediting suggestions, respecting the manner the libellants came in possession of the raft; and was followed by an arrest of the timber on a writ of replevin.

The spars were estimated to be worth from $600 to $800, and from the state of the weather and the season of the year, there is reasonable ground to believe they might have been reclaimed by the claimants without the interposition of the libellants. This, however, must be merely conjectural, and if it had so

<hr/>

[2] That towage may be a salvage service when rendered under circumstances of difficulty or danger, &c., see The H. B. Foster [Case No. 6,290].

turned out, there must, most probably, have been considerable delay and augmentation of expense in effecting their recovery.

The persons sent out in pursuit of the raft, arrived at the Narrows at about 10 a. m., five hours after it had been secured by the libellants, about a mile below that place. If it continued moving on the tide at the rate of two and a half miles the hour, it would, at ten o'clock, have been fourteen miles out at sea below the Narrows. It is hardly supposable that the raft, at that distance, would have been discernible by persons in pursuit of it, nor, if tidings were obtained of its direction, but that considerable expense must have been incurred in getting it back.

I do not consider the situation of the raft to have been desperate, nor but there was a reasonable chance of its being thrown back upon Coney Island or Staten Island by a flood tide; for although the evidence shows that the ebb tide or current chiefly prevailed at that season, yet it is proved by the claimants, that the raft four or five days afterwards, was floated back to the city with great ease, upon the flood tide.

Under the circumstances, the libellants are, in my opinion, entitled to a compensation beyond what was proposed by the claimants, but not an extraordinary one, amounting in any degree to what was demanded by their counsel, to the one half or one third of the value of the timber, or even $100, the sum suggested by the libellants before suit brought.

I shall award them the sum of $50, with costs, considering that a reasonable compensation for the actual service performed by the libellants. As four of the libellants were hired men in the employment of Keteltas, and as the whole business was under his direction and at his expense, $30 of the amount is to be paid to him, and $5 to each of the other libellants. Decree accordingly.